IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DAVID S. BROWN ENTERPRISES, LTD., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. SAG-18-0319 |
| AFFILIATED FM INSURANCE CO., | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs David S. Brown Enterprises LTD ("DSB"), 8227 Mainstreet LLC, and 8231 Mainstreet LLC (collectively "Plaintiffs") filed this case against DSB's businessowners' insurance carrier, Affiliated FM Insurance Company ("Affiliated"), seeking coverage for property damage sustained on the evening of a flood in Ellicott City, Maryland, in July, 2016. The parties have filed cross-motions for summary judgment, ECF 66 ("Affiliated's Motion"), ECF 68 ("Plaintiffs' Motion"), and oppositions and replies to the respective motions, ECF 70, 71. I have reviewed the filings, and despite Plaintiffs' request, find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant Affiliated's Motion and deny Plaintiffs' Motion.

## I.   FACTUAL BACKGROUND

The relevant facts in this case are largely undisputed. On July 30, 2016, roughly 6.6 inches of rainfall occurred during a significant storm in Ellicott City, Maryland, causing extensive flooding. *See, e.g.*, ECF 67-14 ("Records of the rain event indicate Ellicott City, Maryland received a total of 6.6 inches of rain over the course of the evening."). During the storm, a water

main broke on Main Street in Ellicott City, in relatively close proximity to the two properties at issue in this case. *See, e.g.*, ECF 67-10. The foundations of those two properties, 8227 Main Street and 8231 Main Street ("the Main Street Properties"), washed away in the event.

The Main Street Properties are owned by Kara Brown. ECF 66-5 at 17. Kara's husband, Howard Brown, is the owner of DSB, which is a property manager for more than two hundred companies. ECF 66-6 at 12. DSB purchased an insurance policy from Affiliated ("the Policy"), which covered 204 named locations during the coverage period. ECF 67-1. The Main Street Properties were not listed among the named locations in the Policy. *Id.* However, the Policy also provided certain coverage for Unnamed Locations, and the parties have stipulated that unnamed location coverage is available, to some extent, for the Main Street Properties. *Id.*; ECF 67-5. The dispute is over the amount of available coverage.

The Policy provides overall insurance coverage to the named locations in the amount of $750,000,000 "as a result of any one **occurrence** subject to the respective sub-limits of liability." ECF 67-1 at 9.[1] The section of the Policy listing the Sub-limits specifies, "Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, will be the maximum payable and will apply on a per **occurrence** basis." *Id.* The sub-limit ordinarily applicable to Unnamed Locations is $1,000,000. *Id.* at 10. However, the sub-limit for flood is as follows:

> $250,000,000 Flood **annual aggregate** for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood in any **occurrence,** not to exceed:
>
> > $50,000 Flood **annual aggregate** as respects Errors & Omissions, Off-Premises Service Interruption, Unnamed Locations and Supply Chain combined.

---

[1] References to page numbers within the Policy refer to the "AFM Policy Page No." at the bottom of the exhibit.

*Id.* at 9.

Plaintiffs presented a claim to Affiliated on August 1, 2016, shortly after the loss.  ECF 67-2.  More than one year later, Affiliated paid $50,000 for the loss, stating that the loss "is subject to the $50,000 Flood annual aggregate Sub-Limit applying for Unnamed Locations."  ECF 67-17; ECF 67-4.  Plaintiffs disagree with the application of the $50,000 sub-limit, and this lawsuit ensued.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor.  *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).  Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another."  *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

3

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.    ANALYSIS

The parties agree that Maryland law governs their dispute. *See, e.g.*, ECF 66-4 at 11; ECF 67 at 14. Accordingly, this Court will apply Maryland's standard principles of contractual interpretation to assess which sub-limits apply to Plaintiffs' claim. *See People's Ins. Counsel Div. v. State Farm Fire & Cas. Ins. Co.*, 214 Md. App. 438, 453 (2013) (explaining that interpretation of an insurance policy is subject to principles of contract interpretation); *see also United Services Auto. Ass'n v. Riley*, 393 Md. 55, 78 (2006) ("Contract interpretation is undoubtedly a question of law that may be properly determined on summary judgment."). Plaintiffs contend that the flood and the water main break constitute two separate occurrences, entitling them to reap the benefit of two different sub-limits, and that the annual aggregate $50,000 sub-limit does not apply to their claim because the language of that sub-limit requires that additional conditions have been met. ECF 67. Affiliated counters that the Policy's definition of flood incorporates all of the damage

4

the Main Street Properties sustained on July 30, 2016, and that in any event, the damage arose

from only one occurrence and the $50,000 sub-limit is applicable.  ECF 66-4.  As detailed below,

the plain, unambiguous language of the Policy supports Affiliated's interpretation.

### A.   Number of Occurrences

The most straightforward of the disputes between the parties involves the number of

occurrences on July 30, 2016.  As always, the analysis of a contract begins with its plain language.

"Maryland follows the law of objective contract interpretation."  *Sy-Lene of Washington, Inc. v.*

*Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003).  Under that standard, "[t]he written

language embodying the terms of an agreement will govern the rights and liabilities of the parties,

irrespective of the intent of the parties at the time they entered the contract."  *Long v. State*, 371

Md. 72, 84 (2002) (alteration in original) (quoting *Slice v. Carozza Props., Inc.*, 215 Md. 357, 368

(1958)).  "When a policy defines a term in a manner which differs from the ordinary understanding

of that term, the policy definition controls."  *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142 (1991).

Where the policy's language is unambiguous, a court can determine the meaning of the terms as a

matter of law.  *See Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459 (2006).

The Policy defines occurrence as "the sum total of all loss or damage of the type insured,

including any insured Business Interruption loss, arising out of or caused by one discrete event of

physical loss or damage" except as respects terrorism or earth movement, which are not applicable

here.  ECF 67-1 at 66.  In light of that definition, Plaintiffs' argument that there were two

occurrences on July 30, 2016 is unavailing.  The record reflects one discrete event of physical loss

or damage – the foundations of the Main Street Properties were destroyed by water.  Two causes

or factors appear, by all accounts, to have contributed to that discrete event:  the water main break,

which created or exacerbated a channel near the Main Street Properties, and the floodwaters which

flowed into that channel, mixed with the water from the water main, and caused the damage. It is true that a water main break can occur without a flood and a flood can occur without a water main break. Here, however, they occurred together. The fact that there may have been multiple contributing causes leading to the destruction of the Main Street Properties' foundations does not transform the "discrete event of physical loss or damage" into more than one occurrence. Plaintiffs' own experts acknowledge that the water main break, alone, would not have caused the loss. *See* ECF 67-24 at 81 (testimony of William M. Carnes, P.E. ("Carnes") agreeing that "the pressure from the water spray of the broken water main alone could not cause the foundation walls to fail"); ECF 67-13 (Sept. 26, 2016 letter from Carnes stating, "It appears, based on this evidence, that the damage to the referenced addresses was due to the burst water main and the subsequent erosion that it caused. The erosion caused a trench that concentrated the flow of the floodwater along the front foundations of the two building [sic] causing the unique damage that affected these structures."); ECF 67-25 at 40 (testimony of Scott W. Bradley stating, "Sitting here today, my opinion is that it was a combination [of water from the flood and water from the watermain that washed out the sidewalk and grade in front of the buildings]"). Defendant's expert agreed. *See* ECF 66-19 at 32 (testimony of Paul Parfitt that "there was not enough force coming out of — water force coming out of the water main to cause damage to the below grade structural foundational wall.").

The parties cite to a number of cases from other jurisdictions presenting factually distinct scenarios and readily distinguishable policy language. Those cases, as a whole, are unpersuasive and unnecessary to this Court's analysis, which is driven by the clear and unambiguous language of the Policy presented here. Plaintiffs' contention that there were two occurrences on July 30, 2016 lacks merit.

### B.  Flood Definition

The number of occurrences, in any event, is arguably superfluous, because the Policy's definition of flood clearly subsumes any damage caused by the water main break.  That definition provides:

> **flood** means flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries  of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer backup resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.

ECF 67-1 at 66.  The definition of flood, therefore, would preclude a finding that another cause or event "contributing concurrently or in any other sequence of loss" to the water damage from a flood constituted a separate, non-flood occurrence.  The plain language of the Policy is clear that concurrent causes involving a flood are considered part of the flood damage for coverage purposes. As noted above, the record reflects no expert testimony suggesting that the water main break alone, without the accompanying flood waters, would have caused the extensive foundational damage to the Main Street Properties.  Thus, the Policy's definition of flood accords with its definition of occurrence and requires treatment of the entirety of the July 30, 2016 damage under available flood coverage.

### C.  Applicability of $50,000 Sub-Limit

The final issue, then, is whether Affiliated appropriately determined the $50,000 sub-limit applies to Plaintiffs' claim.  Plaintiffs contend that the language, "Flood annual aggregate as respects Errors & Omissions, Off-Premises Service Interruption, Unnamed Locations and Supply Chain combined" means that the $50,000 sub-limit only applies in the almost unimaginable situation in which all of those four coverages are implicated simultaneously, in conjunction with a flood.  ECF 67 at 27-28.  Moreover, for the $50,000 sub-limit to be triggered in Plaintiffs' view,

all five coverages would have to be applicable in a single occurrence. *Id.* That confluence of events is actually impossible. As Affiliated notes, Errors & Omissions coverage and Off-Premises Service Interruption coverage require "physical loss or damage" at an insured location, while Supply Chain coverage requires physical loss or damage at a different location — the insured's supplier, customers, contract service provider, or other company involved in a particular contractual arrangement. ECF 67-1 at 37, 39, 54; ECF 70 at 17. The impossibility of satisfying Plaintiffs' proposed construction makes the construction patently unreasonable.[2] Moreover, even if such an impossible scenario were to transpire, because an insured could avoid application of Plaintiffs' proposed construction of the sub-limit simply by not seeking coverage under one of the five provisions implicated in the sub-limit language, the construction is illogical. *See* ECF 70 at 19. "[I]t is axiomatic under Maryland law that a court should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available." *Catalina Enters. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 66 (4th Cir. 1995).

Instead, there is a straightforward, reasonable construction that gives effect to every word in the Policy's plain language: that the total combined annual aggregate coverages for Errors & Omissions, Off-Premises Service Interruption, Unnamed Locations, and Supply Chain claims caused by flood are limited to $50,000. Because Plaintiffs seek coverage for Unnamed Locations and their claim is for flood damage, the $50,000 sub-limit applies.

---

[2] In the same vein, Unnamed Location coverage cannot be triggered at the same time as Off-Premises Service Interruption coverage because Unnamed Location coverage exempts the kinds of losses covered by Off-Premises Service Interruption coverage, specifically losses affecting "transmission and distribution systems" not on property owned or leased by the insured. *See* ECF 67-1 at 44 (excluding "transmission and distribution systems" from Unnamed Location coverage); ECF 67-1 at 67 (defining "transition and distribution systems" as "systems including . . . electricity, gas, fuel, steam, water, refrigeration, voice, data and video"); ECF 67-1 at 39 (describing Off-Premises Service Interruption Coverage as coverage for losses from interruptions of "electric, gas, fuel, steam, water, refrigeration, . . . sewerage . . . voice, data or video services").

Plaintiffs appear to misconstrue Affiliated's argument as somehow suggesting that an annual aggregate is not a sub-limit.  ECF 71 at 7.  Affiliated argues no such thing.  Instead, the Policy's "sub-limits" apply on a per occurrence basis "unless otherwise stated below or elsewhere in this policy."  ECF 67-1 at 9.  That adverbial phrase permits the Policy to modify the "per occurrence" basis to an annual aggregate for certain sub-limits, as was done in the $50,000 limit for these particular flood claims.  *Id.*

Because the plain language of the Policy reflects that the $50,000 sub-limit is applicable, summary judgment will be granted in favor of Affiliated.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment, ECF 68, will be DENIED, and Affiliated's Motion for Summary Judgment, ECF 66, will be GRANTED.  A separate order follows.

Dated:  December 18, 2020                                         _____/s/_____
                                                                 Stephanie A. Gallagher
                                                                 United States District Judge